Irving R. Stratton v. Commissioner.
Stratton v. Commissioner
Docket No. 83823.
United States Tax Court
T.C. Memo 1962-218; 1962 Tax Ct. Memo LEXIS 92; 21 T.C.M. (CCH) 1159; T.C.M. (RIA) 62218; September 14, 1962
Lee L. Newman, Esq., Northern Life Tower, Seattle, Wash., for the petitioner. Wilford H. Payne, Esq., for the respondent. FISHER
Memorandum Opinion FISHER, Judge: Respondent determined a deficiency in income tax of the petitioner for the year 1956 in the amount of $183.92. The sole issue [1] is whether the loss realized from the sale of a house in 1951 was an ordinary loss deductible only in the year of the loss or a capital loss which can be carried forward to the years in question. All of the evidence is incorporated in the record by stipulation of the parties. The petitioner, Irving R. Stratton, resides in *93 Seattle, Washington. A timely joint income tax return, Form 1040, for the taxable year 1956 was filed by petitioner and his present wife, Harriett A. Stratton, with the district director of internal revenue at Tacoma, Washington. Irving R. Stratton (hereinafter referred to as petitioner or Irving), is a member of the Bar of the State of Washington and had been in the practice of law in that state from 1927 until his retirement for reasons of health in 1952. In 1945, while married to Carol Stratton, and then residing with her on Greenwood Street, Seattle, Washington, Irving became interested in building a "premium" house as an investment on which he could realize a substantial amount of profit. He planned to have such a house constructed in an uninhabited area near Seattle, and then to sell it before the area was developed for residential purposes. In furtherance of this plan, petitioner acquired a large lot for $3,650 in Elford Park, a relatively wild area which was a substantial distance from other homes. In 1946, Irving retained an architect and contractor to begin the building of a large home, about 40 feet by 86 feet with basement and ground floor, on the Elford Park lot. The *94 contractor and architect continued on the work until July 1947 at which time petitioner made an investigation of the premises, determined that greatly inferior work had been done, and dismissed both of them when they refused to correct the errors. All work ceased at that time because the laborers also lost their subcontracts. During the period that the first contractor was working on the premises, petitioner retained one of the workmen to act as a watchman on the lot after working hours. Irving considered this necessary because the lot was a great distance from law enforcement agencies and it would be impossible for the latter to keep all intruders off the property. The watchman was supplied with a cot and gun by Irving and was deputized by the sheriff. When the contractor was released in 1947, the watchman left his job, and there was a period of about three weeks in which no one was stationed at the project. Petitioner's first wife, Carol Stratton, began proceedings for divorce about the time that the construction ceased on the Elford Park home. Irving was granted the divorce by the courts and the two of them arranged a property settlement whereby Carol was to receive her fair *95 share of the profits from the sale of the home. In July of 1947, Irving retained Richard Lewis as the new watchman for the home, added some furniture to the partially completed house, purchased Lewis some clothing and arranged for him to remain at the property to keep marauders and prowlers away. Shortly afterwards, petitioner left for South America in the course of his law practice. Upon his return from South America in September, Irving moved into the New Washington Hotel. Lewis informed him he was to be married and would quit the watchman's job. Subsequently, Irving met with Lewis's wife and persuaded the family to move into the incompleted home. Petitioner furnished the house with additional furniture and supplied some of the food for the family. The house, however, was still very much unfinished. There were no coverings for the floors. No paint had been put on the interior nor were the storage facilities finished. A new contractor was retained and work commenced anew on the house. After the new contractor began work on the house, petitioner retained several real estate firms in the Seattle area to sell the house. The original price asked was $47,500 and this price was slowly *96 reduced due to the absence of offers to purchase. Whenever the real estate brokers had prospective customers, the Lewises would show them around, and on some occasions the house was left open for inspection to the public. Petitioner slept at the house for part of this period. Lewis's wife prepared some of his meals, although petitioner spent little time there inasmuch as he continued to work with his law practice. Petitioner did find it necessary to make repeated investigations of the work progress and to discuss various needs with the workmen. Petitioner became dissatisfied with the Lewis family's presence at the house and they left in January 1948. In November 1947, petitioner was introduced to his present wife, Harriett A. Stratton, an interior decorator who had heard about petitioner's difficulties with his house. Harriett spent spare time at the house endeavoring to furnish the interior to make it more attractive to the prospective buyers that were conducted through it by the real estate agents or by the Lewises. Petitioner and Harriett were married on April 24, 1948. Harriett obtained a woman named Nichols to reside at the Elford Park house as its housekeeper. Both Irving *97 and Harriett decided to stay at the house to conduct the decorating and furnishing of it, even though Harriett owned a fully furnished home on Second Avenue, Northwest, Seattle. Harriett met Colin Fox and his wife on their return from a South American trip and persuaded them to live at her home on Second Avenue while she stayed at the Elford Park house to conduct the decorating in her spare time. Both Irving and Harriett continued to spend only their spare time with the new house, that is on weekends and after normal work hours. They removed some furniture, which Irving had received from his parents, from a warehouse where it had been stored and used it to partly prepare the house for display to buyers. Irving became dissatisfied with the work done by the new contractor, Stanley Kartak, and refused to pay him. As a result, Kartak instituted a lawsuit against Irving, but Irving filed a cross-suit and on November 19, 1948, was awarded judgment in the sum of $47.37 for damage done to the property. Slow workmanship and the unfinished character of the house were partly responsible for a continued reduction in its sales price. In August 1949, Irving made a second trip to South America. *98 During his absence, Harriett continued to work on decorating the house but found it too difficult to continue and decided that she would return to her residence on Second Avenue. Upon Irving's return from South America, Harriett informed him of her decision to return to her residence and to cease activity at the Elford Park house. Petitioner moved into the Second Avenue residence with Harriett. Shortly after moving to Harriett's residence, Irving rented the Elford Park house to a couple named Kennedy. The rent was $150 per month and the Kennedys understood that they had an option to buy the residence. It was also understood that they were to show the home to prospective buyers and keep the house open for inspection. The Kennedys continued to rent the premises until petitioner sold it to George Guttormsen for $32,000 in March 1951. Irving incurred sales costs of $3,200 and also paid the Kennedys $300 from the proceeds of the sale for their agreement to show the home while still renting it. During the period of renting, the following depreciation and expenses were deducted on the 1949, 1950 and 1951 tax returns: Year
Depreciation
Expenses
1949
$ 331.57
$350.63
1950
1,326.27
613.91
1951
485.71
22.58
*99 Petitioner's basis for the Elford Park house at the date of sale was $47,239.65. The loss suffered on the sale was in excess of $17,000. On petitioners' 1951 tax return they reported a $1,000 capital loss on the sale of the house and showed a capital loss carryover of $6,559.49. In each of the years before the Court, petitioners deducted $1,000 as a capital loss carryover. Respondent determined that the house was held by petitioner in a trade or business and that the loss incurred was an ordinary loss, not subject to the capital loss carryover provisions. Since the tax year of 1951, the year of the sale, resulted in no tax due, even with the use of only $1,000 of the loss, no adjustment was made for that year. The years before the Court in the earlier case T.C.M. 1958-214) were 1952, 1953 and 1954. The only year involved in the instant case is 1956. The issue is whether the loss realized from the sale of the house in 1951 was an ordinary loss, deductible only in the year of sale, or was a capital loss, which can be carried forward to the years in question. The answer to this issue depends on whether petitioner held the house in a trade or business, and thereby the property was *100 excluded from the definition of a capital asset in section 117(a) of the Internal Revenue Code of 1939. Respondent contends that the mere renting of the house for the period 1949 to 1951 constituted the carrying on of a trade or business and that the house constituted the property used in the trade or business. Petitioner, on the other hand, argues that the house was constructed only as an investment, that he never was in the trade or business of construction or in the trade or business of renting, that the property was held solely for the production of income, that it constituted a capital asset, and that it did not lose its identity as a capital asset by reason of the fact that the property was rented for the 1949-51 period. We agree with the respondent. From the entire record, we conclude that the loss sustained from the sale of the Elford Park residence in 1951 was a loss on property used in petitioner's trade or business of a character which is subject to the allowance for depreciation provided by section 23(1) of the 1939 Code. This Court has repeatedly held that the renting of improved real estate constitutes the carrying on of a trade or business, regardless of whether or *101 not the taxpayer engaged in any other trade or business, and the property is, therefore, excluded from the definition of a capital asset as defined by section 117(a)(1). Leland Hazard, 7 T.C. 372 (1946); John D. Fackler, 45 B.T.A. 708 (1941), affd. 133 F. 2d 509 (C.A. 6, 1943); George S. Jephson, 37 B.T.A. 1117 (1938). We find no reason to depart from this principle at this late date nor has petitioner indicated facts which are sufficient to distinguish the instant case from those authorities. As requested by petitioner on brief, we have given careful consideration to Exhibits 2, 3 and 4 which represent evidence not before the Court in the prior case T.C.M. 1958-214). We find nothing in said exhibits which in any way affect our conclusion. In view of our holding, there is no occasion for us to consider respondent's additional argument relating to equitable or collateral estoppel. Decision will be entered under Rule 50. Footnotes
1. The basic issue in the instant case is identical in principle with that involved in Irving R. Stratton, T.C.M. 1958-214.↩